**PAULINE VARHOLY v. REX SWEAT, as Sheriff of Duval County, State of Florida.**

15 So. (2nd) 267

October 8, 1943

June Term, 1943

Division B

*Carlton C. Arnow* and *Edgar W. Waybright,* for plaintiff in error.

*J. Tom Watson,* Attorney General, *Lewis W. Petteway,* Assistant Attorney General, *Harry H. Martin,* County Solicitor for Duval County, and *Philip S. May,* for defendant in error.

BROWN, J.:

This is an appeal from an order entered by Judge Bayard B. Shields, one of the Judges of the Circuit Court for Duval County, in a habeas corpus proceedings brought in that court to secure the release of the plaintiff in error from detention under a quarantine order entered by a deputy health officer,

Nathaniel Jones, M. D., on the ground that the petitioner in the court below had a communicable venereal disease.

In her petition for writ of habeas corpus, the petitioner, plaintiff in error here, alleged that she was confined in the county jail of Duval County charged with the offense of being drunk and disorderly; that at the hearing before the justice of the peace no evidence was produced showing that there was proper ground to hold her to answer such charge, and that the justice of the peace had set her appearance bond in the amount of $500.00, which amount was excessive. The respondent sheriff filed his return to the writ of habeas corpus showing that he was holding the petitioner by virtue of a commitment and an order of quarantine by the health officer above named. The petitioner came on to be heard before the circuit judge, who announced that he would first go into the question of the reasonableness and justness of the quarantine and would later take up the question of the excessiveness of bail on the criminal charge.

Health officer, Dr. Jones, testified that petitioner had voluntarily submitted to an examination and that the laboratory reports of the State Board of Health, which appear in the transcript, showed that the petitioner was infected with a venereal disease, though there was a negative report as to the presence of syphilis. Dr. Jones further stated that the purpose of the quarantine was to remove the infected individual from society so that she might be treated. Dr. Jones also testified that in addition to being a State health officer, he was with the United States Public Health Service Reserve Corps, and assigned to the State of Florida with the Division of Venereal Control and that he was also Director of the City-County Venereal Disease Clinic. His testimony also shows that the petitioner, while confined in the county jail, was quarantined therein pending transfer to one of the quarantine hospitals operated by the State Board of Health for the isolation and treatment of persons infected with venereal diseases. The Doctor testified that camps had been erected for the isolation and treatment of cases of this kind until they are cured, which frequently happens in a very few weeks; that they were not incarcerated as in a jail but merely

isolated for treatment until they are cured of the disease. He also stated that the State Board of Health did not have any facilities for isolating and treating cases of that kind in the homes of the individuals thus infected.

The petitioner testified that she had been steadily employed at the St. John's River Ship Building Company since December, 1942, and her landlady testified that petitioner spent most of her evenings at home studying the books that the Company gave their employees so that they might learn their trade better. There was no testimony of immoral habits on the part of the petitioner. She testified that she was married and that her husband was in the Army and stationed at Camp Shelby, Mississippi and that he came down to see her whenever he got a furlough. She also testified that she had never been convicted of any crime whatsoever.

After hearing and considering the evidence and exhibits, the Court entered an order to the effect that the evidence showed that the defendant was infected with a venereal disease, to-wit, gonorrhea, and that she had been duly quarantined by the Deputy State Officer of the State Board of Health for the duration of such disease, and that said quarantine was reasonable and proper. He accordingly denied the petition for writ of habeas corpus and ordered that petitioner remain under quarantine for treatment for said disease, under the supervision of the State Board of Health, until petitioner is cured of said disease; and that upon the cure of said petitioner the Court would then consider the application to reduce the bond under the charge of unlawful intoxication and breach of the public peace.

Since 1919 we have had statutes dealing with this subject and we had occasion to refer to them in the case of Lewis v. City of Miami, 127 Fla. 426, 173 So. 150, wherein, in an opinion by Mr. Justice DAVIS, it was said:

"Under Sections 3947-3955 C.G.L., 7829, Acts 1919, the public policy of this State has been legislatively declared in favor of the protection of the interest of the inhabitants of this State, as individuals, from exposure to persons known to be afflicted with vile and loathesome communicable infections, contagious and communicable venereal diseases, such

as syphilis, gonorrhea and chancroid. Under that statute all persons confined or imprisoned in any municipal prison of this State are subject to being examined and treated for venereal diseases by the health authorities or their deputies. Section 3952 C.G.L. And to that end persons found infected with venereal diseases may be compulsorily detained and treated in order to prevent the dissemination of the infection. Section 3951 C.G.L."

Sections 3951 to 3954 inclusive C.G.L., with some changes made by the Legislature since the original enactment, now appear as Sections 384.06 to 384.10 of Florida Statutes 1941. Section 3952 C.G.L. now Section 384.08 Florida Statutes 1941, relating to the examination and treatment for venereal diseases of persons confined in any state, county or city prison, as in some respects amended by Sections 1 to 4 of Chapter 21, 948, Acts of 1943, are applicable here under the evidence in this case and justify the order made by the circuit judge. Section 3953 C.G.L. and Section 384.09 Florida Statutes 1941 vest the State Board of Health with authority to make rules and regulations concerning the isolation and treatment of persons infected with venereal diseases. And the State Board of Health has adopted regulations on this subject, one of which authorizes the health officer to quarantine infected persons either on the premises in which they live, or in any other place, hospital or institution in the jurisdiction that may have been provided, and if no such place has been provided, confinement in the county or city jail under quarantine may be resorted to. See also Chapter 21948, Laws of 1943.

Generally speaking, rules and regulations necessary to protect the public health are legislative questions, and appropriate methods intended and calculated to accomplish these ends will not be disturbed by the courts. All reasonable presumptions should be indulged in favor of the validity of the action of the Legislature and the duly constituted health authorities. But the constitutional guarantees of personal liberty and private property cannot be unreasonably and arbitrarily invaded. The courts have the right to inquire into any alleged unconstitutional exercise or abuse of the police

powers of the Legislature, or of the health authorities in the enactment of statutes or regulations, or the abuse or misuse by the Boards of Health or their officers and agents of such authority as may be lawfully vested in them by such statutes or regulations.

However, the preservation of the public health is one of the prime duties resting upon the sovereign power of the State. The health of the people has long been recognized as one of the greatest social and economic blessings. The enactment and enforcement of necessary and appropriate health laws and regulations is a legitimate exercise of the police power which is inherent in the State and which it cannot surrender. The Federal government also possesses similar powers with respect to subjects within its jurisdiction. The constitutional guarantees of life, liberty and property, of which a person cannot be deprived without due process of law do not limit the exercise of the police power of the State to preserve the public health so long as that power is reasonably and fairly exercised and not abused. The legislative authority in this legitimate field of the police power, like as in other fields, is fenced about by constitutional limitations, and it cannot properly be exercised beyond such reasonable interferences with the liberty of action of individuals as are really necessary to preserve and protect the pubic health. It has been said that the test, when such regulations are called in question, is whether they have some actual and reasonable relation to the maintenance and promotion of the public health and welfare, and whether such is in fact the end sought to be attained. Not only must every reasonable presumption be indulged in favor of the validity of legislative action in this important field, but also in favor of the validity of the regulations and actions of the health authorities.

The general law on the subject will be found very well reviewed in 25 Am. Jur., pp. 285 to 321; 29 C.J., pp. 239 to 271; and 12 R.C.L., 1263 to 1292. In the last cited authority, at page 1271, it is said:

"Health regulations are of the utmost consequence to the general welfare, and, if they be reasonable, impartial, and not against the general policy of the State, they must be submitted to by individuals for the good of the public."

It might be noted that after making its order the Court announced that when the petitioner was cured he would reduce the bond set by the justice of the peace in the criminal proceeding probably to one hundred dollars, or some other nominal sum.

We recently denied, without opinion, an application for release of appellant on an appearance bond pending disposition of this appeal. We might well now state our reasons for denying such application. Our view was that plaintiff-in-error was being held under a quarantine order, which is not a criminal proceeding, and hence not bailable. As soon as plaintiff in error is cured and released from quarantine, the court below has very properly announced that she will be promptly released from custody on a nominal bail bond to appear and answer the minor criminal charge for which she was arrested. Sections 8 and 9 of our Declaration of Rights guarantee the right to bail in criminal cases, with one exception. As this Court expressed it in Ex Parte Hatcher, 86 Fla. 330, 98 So. 72: "The right to bail of one accused of crime by sufficient sureties, except for capital offenses where the proof is evident or the presumption great, is absolute." In 6 Am. Jur., 48, it is said that: "The object of bail in civil cases is either directly or indirectly to secure the payment of a debt or other civil duty, while the object of bail in criminal cases is to secure the presence of the principal before the court for the purpose of public justice." See also 8 C.J.S. 4. This Court has also held that our constituional provisions with reference to bail do not apply to a person held under extradition proceedings charged with an offense against the laws of another state. State v. Quigg, 91 Fla. 197, 107 So. 409. To grant release on bail to persons isolated and detained on a quarantine order because they have a contagious disease which makes them dangerous to others, or to the public in general, would render quarantine laws and regulations nugatory and of no avail.

Our conclusion is that the lower court in this case was justified by the evidence and the order appealed from is hereby affirmed.

Affirmed.

BUFORD, C. J., THOMAS and SEBRING, JJ., concur.